UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MURPHY ENERGY SERVICES LLC, and KEVIN PAUL MURPHY,<br><br>               Plaintiffs,<br><br>     -against-<br><br>WORLD BUSINESS LENDERS, LLC, ROBERT DeSTEFANO, and UNKNOWN PERSON OR ENTITY D/B/A WHOLESALE TERM LOANS ONLINE CORP.,<br><br>             Defendants. | **COMPLAINT**<br><br> Docket No. 26-cv-5915<br><br>**JURY TRIAL DEMANDED** |

*"You are only dating us; you will marry him."*

**-Robert DeStefano, World Business Lenders LLC**

**BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP**
666 Old Country Road, Suite 700
Garden City, New York 11530

**INTRODUCTION**

1.      This case is about a bait-and-switch scam concocted by the Defendants and others, pursuant to which they secured agreements to predatory loans through promises that these loans and related payments were necessary to secure more favorable deals and terms in the immediate future.  These down-stream deals were repeatedly promised, held out, and then dragged backward with every passing week, as the scam lured the increasingly desperate Plaintiffs into the payment of purported fees, expenses, and loans—all under the guise that the "real" transaction was only right around the corner.  In the words of one representative of Defendant World Business Lenders LLC, "you are only dating us; you will marry [the more favorable lender]."  In truth, the anticipated relationship was not one of dating or marriage, but fraud—and one that successfully duped the Plaintiffs into the expenditure of hundreds of thousands of dollars.

2.      Through this case, Plaintiffs seek to recoup their losses, plus treble damages, and to achieve rescission of any further contractual relationship with the Defendants.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction pursuant to 28 U.S.C. §1332, as the Plaintiffs and Defendants are diverse from each other and the matter in controversy exceeds the statutory minimum.

4.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over state law causes of action arising from the same set of transactions or occurrences as the federal claims.

5.      Venue is proper in the Southern District of New York under, *inter alia,* 28 U.S.C. § 1391(b), as, on information and belief, New York County, New York is the location of the incorporation of the defendant World Business Lenders LLC entity and, on information and belief,

a substantial portion of the events forming the basis of the claim occurred in the State of New York.

6.    A jury trial is hereby demanded.

**PARTIES**

7.    Plaintiff Murphy Energy Services ("MES") is a corporation with a principal place of business in the State of North Carolina.

8.    Plaintiff Kevin Paul Murphy is a resident of the State of North Carolina, and is the Chief Executive Officer of MES.

9.    Defendant World Business Lenders ("WBL") is, on information and belief, a domestic corporation organized under the laws of the State of New York and operating out of the State of, inter alia, New York and New Jersey.

10.    Defendant Robert DeStefano was at all times acting as an agent for WBL, with its assent, for its benefit, and under its control, and on information and belief is a resident of the State of New York.

11.    Defendant Unknown Person(s) or Entity d/b/a Wholesale Term Loans Online Corp. is a person or entity claiming to act through an individual claiming to be named "James Williams" on behalf of an entity claiming to be called Wholesale Term Loans Online Corp.  On information and belief, "James Williams" is a fictitious person, and the true party in interest person bears the initials S.W., with a name known to counsel, but this matter of identification remains under investigation and subject to discovery.

**BACKGROUND**

12.     On September 3, 2024, a purported company called Wholesale Term Loans Online (hereafter, "WTLO") connected with MES's president, Kevin Murphy, through an individual with the purported name of James Williams.  The following day, WTLO informed Murphy that MES was approved for a half-million-dollar unsecured loan with a 6.875% interest rate over a five-year term.  This reflected the opening step in a trap that came to fruition over the course of the next several months.

13.     On September 5, 2024, WTLO told Murphy that he needed to make a $9,871.14 deposit to lock in the interest rate for the purported loan.  Murphy complied and conveyed the money to WTLO via wire.

14.     Four days later, WTLO had still not issued the promised loan and so Murphy attempted to cancel it.  Upon this attempt, the man claiming to be James Williams called Murphy and doubled down:  the reason why the loan was not funded, he said, was simply because of his attempted cancellation.  This pep-talk convinced Murphy to stick with the transaction, and to continue diving deeper down the rabbit hole.

15.     On September 18, "Williams" told Murphy to expect a link to an online portal that he could use to access the funds from the WTLO loan.  He received no such thing.

16.     Instead, he received an email with a link to a bank verification platform, and an invoice seeking payment of an initial processing and underwriting fee to a company who now appeared for the first time:  World Business Lenders ("WBL").

17.     The invoice was for $1,475, and Murphy paid it.

18.     On September 19, WBL called Murphy to "welcome" him.

3

19. The following day, he completed a welcome form, expecting, based on Williams's ongoing representations, to then be funded immediately. These assurances from Williams continued on for days.

20. On or about September 25, Murphy had a discussion with Williams, during which time Murphy raised the observation that the WBL loan terms were far more stringent than Williams's prior representations and claimed term sheets. Williams explained that Murphy needed to obtain a secured loan through WBL as a prerequisite to receiving the larger funding from WTLO.

21. By this time, Murphy had thrown all of his time and energy into this one line of funding and was now worn down, cornered and desperate.

22. On October 2, he submitted documents to WBL, received an email from WBL (copying WTLO) concerning certain due diligence matters, and engaged in several more days of assurances and communications.

23. Finally, on or about October 7, Murphy and MES signed a purported loan agreement with WBL (the "Agreement").

24. The Agreement contained highly predatory terms.

25. On its face, it demanded payment within three years of $1.681 million—in exchange for a principal loan amount purporting to equal $900,000.

26. On its face, then, the loan Agreement carried a premium exceeding 86%--secured by Murphy's house, which it required that he pledge as collateral.

27. In terms of the language of the Agreement, it purportedly carried an interest rate of 0.0986% per day.

28.    But making matters worse, of this $900,000 principal, WBL never actually conveyed $249,999 of it.

29.    Instead, through a purported "Holdback," it simply withheld the money and pretended that it had been (or would be) conveyed and then repaid back to WBL with only about $100,818 in principal—deriving nearly $150,000 in additional interest out of thin air.

30.    Thus, the real transaction with WBL reflected a loan of $650,001 in principal to MES before fees ($900,000 minus $249,999), with an obligation to repay $1,581,281[1]—reflecting a premium in the amount of 243%, with an interest rate far in excess of what the Agreement purported.[2]

31.    The "Holdback" reflected a deliberate attempt to camouflage the exorbitant rate of interest that undergirded the transaction, and to afford a pretext for misstating that rate of interest as part of WBL's deceptive business practices.

32.    This deal, it turns out, was not a pathway to reaching the destination of a desirable loan from WTLO.  This predatory transaction with WBL was always the intended destination, with the WTLO loan acting instead as pure bait before the switch.

33.    After entering into the predatory WBL transaction between October 11, 2024 and the end of the year, Murphy and MES engaged in multiple further communications with "Williams" in an attempt to close the WTLO transaction.

---

[1] This reflects the payback amount listed in the contract, minus the approximately $100,818 in principal that was fictionally immediately repaid.

[2] To simplify the fraudulent methodology of this transaction, suppose a more straightforward transaction—lender issues a $10 loan with an obligation for the borrower to pay $15 in one year, but then "holds back" $9.  This machination then results in an actual loan of $1 in exchange for $5 of interest—converting a loan with an interest rate of 50% into one with an interest rate of 500%.

34.    In the process, Plaintiffs paid nearly $90,000 to WTLO hoping the favorable loan would ultimately materialize.  Nothing ever did.

35.    Showing clear consciousness of guilt, WBL recorded the closing session with Murphy during which WBL asked him whether he had been promised anything, such as a competitive term loan, in return for entering into the WBL Agreement.  In advance of this question, off camera, he had been coached by Williams to say no—which ran directly contrary to the nature of his dealings with WBL and WTLO, which included, for instance, a communication with WBL's Robert DeStefano, who confirmed that the WBL positions are typically refinanced within six months; that he had worked with "James Williams" before; and—drawing the connection between WBL and WTLO closely together—he offered a pithy description of the relationship:  "you are only dating us [WBL]; you will marry [WTLO]."

36.    These representations from DeStefano were knowingly false.

37.    These representations from DeStefano were designed to induce Plaintiffs to enter into the WBL transaction.

38.    Diving deeper into the mechanics of this transaction reveals additional troubling facts about the parties behind this operation.

39.    Most notably, while never acknowledging this to Plaintiffs at any time during the course of these deals,[3] it appears that the true party in interest behind the veil is a man with the initials S.W.

---

[3] Of note, under North Carolina law, "no person shall engage in the mortgage business or act as a mortgage loan originator with respect to any dwelling located in this State without first obtaining and maintaining a license under this Article."  *See* North Carolina General Statutes §53-2440.040.  In the context of these license and disclosure requirements, a mortgage loan "originator" includes those who are "compensated by a mortgage lender, mortgage broker, or mortgage loan originator"—as we suspect Person of Interest 1 was compensated.  *See* North Carolina General Statutes §21(c)(2).  For purposes of civil fraud claims, these rules underscore the materiality to North Carolina borrowers of knowing their counterparties in North Carolina mortgage agreement, as was the case here, and being able to rely on the legitimacy of such individuals—a reliance that Murphy never would have extended if he suspected the involvement of Person of Interest 1, whose role in this transaction, and the true breakdown of commissions, was

40.    In fact, one of the wiring instructions given to Plaintiffs—purportedly by WTLO—led back to a bank account not for WTLO, but for a Florida corporation which has one listed director:  S.W.  In turn, according to reports on DailyFunder, S.W. is a "scam artist," "notorious for creating several different ISO shops using fake names," and the dba for the Florida corporation in issue is almost identical to *Wholesale* Term Loans Online—namely, "*Business* Term Loans Online."

41.    The report continues that S.W. "creates fake term sheets to show customers they are approved for 10x what the real offer is," then he "tells them to take the first installment and they will get the rest, except they never do and he disappears."

42.    To date, Plaintiffs have conveyed $599,819.25 (plus $68,540 in "fees") to WBL, and an additional $82,944.88 to the person or entity claiming to be WTLO—for a total of $751,304.13.

43.    They still purportedly owe in excess of $825,000.

## CAUSES OF ACTION

### FIRST:  FRAUD IN THE INDUCEMENT

44.    Plaintiffs repeat all prior allegations as if set forth more fully herein.

45.    WBL, DeStefano, WTLO, and S.W. were at all relevant times acting in concert with each other to induce Plaintiffs to enter into the Agreement based upon the false representation of the availability of an unsecured loan on favorable terms which, in reality, was never going to be made available to Plaintiffs.

---

never disclosed to Murphy whatsoever.  The extent to which these rules and related regulations were violated in this agreement remains subject to ongoing investigation.

7

46. In furtherance of this conspiracy and fraud, Defendants falsely represented that Plaintiffs would be entitled to the proposed unsecured loan through WTLO, and omitted their knowledge that no such deal was ever actually going to transpire.

47. In furtherance of this conspiracy and fraud, DeStefano falsely represented that the deal with WBL was only a temporary road-stop on the way to a long-term deal with WTLO— knowing that no such WTLO deal would ever materialize.

48. In additional furtherance of this conspiracy, WBL, DeStefano, and WTLO omitted material information about the involvement of, and commissions flowing to, S.W. in connection with the payments made by Plaintiffs.

49. The false representations and material omissions were reasonably calculated to deceive Plaintiffs, with intent to deceive Plaintiffs, about the benefits of entering into the Agreement with WBL.

50. The false representations and material omissions did indeed deceive Plaintiffs and induce their execution of the WBL Agreement, which Plaintiffs would not have done absent the material misstatements and omissions.

51. The false representations and omissions, and resulting reliance by Plaintiffs, caused substantial damages to Plaintiffs—including $599,819.25 (plus $68,540 in "fees") to WBL, and an additional $82,944.88 to the person or entity claiming to be WTLO—for a total of $751,304.13. The total amount of money or consideration received by Plaintiffs in connection with the Agreement was $581,461, leaving $169,843.13 in out-of-pocket losses as of July 9, 2026.

52. Plaintiffs are entitled to damages including repayment of all losses and rescission of all further obligations under the purported WBL Agreement.

8

## SECOND:  DECEPTIVE TRADE PRACTICES IN VIOLATION OF NORTH CAROLINA GENERAL STATUTE 75-1.1

53.     Plaintiffs repeat all prior allegations as if set forth more fully herein.

54.     The Agreement in issue contains a choice of law provision for the State of MES, namely, North Carolina.[4]

55.     North Carolina law, General Statute 75-1.1, prohibits deceptive trade practices.

56.     WBL engaged in deceptive trade practices, through, inter alia:

   a.   the misrepresentation of the interest rate in the Agreement;

   b.   the machination of the phantom "Holdback" amount;

   c.   the withholding of information about the involvement of S.W. in the overall transactions, which, in turn, also violated North Carolina disclosure and licensing laws concerning loans secured by real property[5]; and

   d.   with the other parties and persons identified in these pleadings, the conspiracy to fraudulently induce Plaintiffs to enter into the Agreement based upon the false promise of an unsecured loan (collectively, the "Deceptive Trade Practices").

(collectively, the "Deceptive Trade Practices").

---

[4] The Agreement also contains a more narrowly drafted forum selection clause.  While the choice of law provision pertains broadly to the Loan Agreement "and all matters arising out of or relating to [it], whether sounding in contract, tort, statute or otherwise," the forum selection clause pertains more narrowly to proceedings brought by the lender to enforce the loan terms—or, in the contract's words, any proceeding to "enforce any rights or obligations arising out of this Loan" noting that "Borrower waives personal service of process and agrees that a summons and complaint commencing an action … in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Borrower…."

[5] Under North Carolina law, "no person shall engage in the mortgage business or act as a mortgage loan originator with respect to any dwelling located in this State without first obtaining and maintaining a license under this Article." *See* North Carolina General Statutes §53-2440.040.  In the context of these license and disclosure requirements, a mortgage loan "originator" includes those who are "compensated by a mortgage lender, mortgage broker, or mortgage loan originator"—as on information and belief S.W. was compensated.  *See* North Carolina General Statutes §21(c)(2).

9

57.     The Deceptive Trade Practices were in or affecting commerce and affected commercial transactions with Plaintiffs.

58.     The Deceptive Trade Practices proximately caused actual injury to Plaintiffs, who as of July 9, 2026 suffered out of pocket losses in an amount of $169,843.13.

59.     Plaintiffs are entitled to treble damages (in the amount of **$509,529.39**)[6] and all other relief to which they are entitled.

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.     That the Court award compensatory and treble damages to Plaintiffs and against the defendants jointly and severally, in an amount to be determined at trial;

B.     That the Court award punitive damages to Plaintiffs, and against all defendants, in an amount to be determined at trial that will deter such conduct by defendants in the future;

C.     That the Court award attorney's fees, costs and disbursements;

D.     For a trial by jury;

E.     For a pre-judgment and post-judgment interest and recovery of their costs; and

F.     For any and all other relief to which they may be entitled.

Dated: Garden City, New York
       July 13, 2026                    **BARKET EPSTEIN KEARON
                                        ALDEA & LOTURCO, LLP**

                            By:    /s/ *Alexander Klein*
                                   Alexander Klein, Esq.
                                   666 Old Country Road, Suite 700
                                   Garden City, New York 11530
                                   aklein@barketepstein.com

---

[6] This measure of damages will increase as funds continue to be used to pay toward the Agreement.

10